## Case No. 3,002.

In re COLLIER et al.

[12 N. B. R. 266.][1]

District Court, D. Kentucky. Nov. 25, 1874.

AGREEMENT OF PARTNER TO PAY FIRM DEBTS — TRANSFER OF FIRM ASSETS TO PARTNER—RIGHTS OF FIRM CREDITORS.

1. In the absence of fraud, joint debts may be converted into individual debts by one partner's undertaking, for a good consideration, to pay them.

2. If the partners, more than four months before the commencement of the proceedings in bankruptcy, transferred all their property, both separate and joint, to one partner, who undertook to pay the firm debts, all the assets

[3] It is remarkable that the argument in this case turned entirely upon the point whether the federal power of naturalization was exclusive or concurrent; and nothing was said by either side respecting the existence and operation of the act of Pennsylvania, which, as it depended in form and spirit on the old constitution, was virtually repealed when that constitution was abolished. The ideas of the reporter on that subject are contained in a note upon the naturalization laws of Pennsylvania in his edition of the acts of the general assembly (volume 1, p. 7a). It may be proper to add that there has since been a decision before Judge Biddle, in the common pleas of Philadelphia county, where the existence of the Pennsylvania law was the gist of the controversy; and in that case, as well as the case of U. S. v. Villato [Case No. 16,622], the act of assembly was adjudged to be obsolete.

[1] [Reprinted by permission.]

will be treated as the separate assets of that partner.

3. A promise by one partner to pay all the firm debts may be enforced by the firm creditors, although they were not cognizant of the promise when made, and although the consideration did not move from them.

4. If there is no joint estate, the firm creditors may share pari passu in the separate estate.

[Cited in Re Lloyd, 22 Fed. 90; Re West, 39 Fed. 203.]

[Opinion of Wilbur F. Browder, Register in Bankruptcy:]

A question having arisen, in the course of the proceedings in this cause, as to what debts were properly chargeable to the assets of the firm, and what to the assets of the separate members thereof, the assignee called a meeting of all the creditors, which meeting was accordingly held in the courthouse at Franklin, Ky., on the 28th day of March, 1874. It was unanimously resolved by this body that W. W. Bush, Esq., and Geo. C. Harris, Esq., were empowered and directed to "reduce to writing an agreed statement of facts" touching the issue above-mentioned. These gentlemen have executed this commission, and from the carefully-prepared statement and exhibits filed by them it appears that the copartnership of Collier, Taylor & Co., now bankrupts, was organized and went into operation in 1868, and conducted its business in Franklin, Ky., and elsewhere; that this company was composed of J. A. Taylor, Wm. F. Collier, and R. H. Collier; that it was an equal partnership, each member owning one-third thereof; that this firm continued its business operations until the 14th day of February, 1873, on which day it was by mutual consent dissolved. Prior to the dissolution, however, the partners had caused an invoice to be taken, from which it appeared that the liabilities of the concern exceeded its assets forty-six thousand four hundred and seventy dollars and twenty-four cents. W. F. and R. H. Collier owned very little property compared with the estate owned by their copartner, J. A. Taylor, which latter estate was of considerable size and value. The balance-sheet struck as hereinbefore-mentioned showed that the three partners, as between themselves, stood thus: in order to equalize them W. F. Collier would have to pay twenty thousand one hundred and fifty-seven dollars and thirty-nine cents; R. H. Collier would have to pay seventeen thousand and eight dollars and seventy-nine cents: J. A. Taylor would have to pay nine thousand three hundred and four dollars and six cents. In view of these facts it was agreed by and between the partners to dissolve the copartnership, and, further, that W. F. and R. H. Collier should transfer and convey to their copartner, J. A. Taylor, their undivided interest in and to the partnership property, and to transfer and convey to him all their separate property, personal, real and mixed, in order to help him the better

to bear the losses. To this arrangement Taylor assented, and in consideration thereof agreed to assume and pay off the firm debts, stipulating, nevertheless, that the two retiring partners should account to him for their respective shares of the joint liabilities outstanding, after having credited them by the value of the property conveyed by them to him as aforesaid. On the 13th day of February, 1873, pursuant to this agreement, R. H. Collier and wife conveyed to Taylor all the real estate owned by R. H. The consideration expressed in the deed is thus set forth, "for and in consideration of five thousand dollars, to be credited on R. H. Collier's indebtedness to Collier, Munday & Taylor and Collier, Taylor & Co." On the same day W. F. Collier and wife conveyed to J. A. Taylor all the real estate owned by said W. F. in consideration of said W. F. Collier's indebtedness to Collier, Taylor & Co. On the same day R. H. Collier and wife and W. F. Collier and wife conveyed to J. A. Taylor all their joint interest in and to the real estate owned by said R. H. and W. F. Collier as joint tenants and otherwise, in consideration of their indebtedness to Collier, Taylor & Co. On the 14th day of February, 1873, the partners, W. F. Collier, R. H. Collier, and J. A. Taylor, executed an instrument of writing, reciting (1) a settlement of all the partnership matters as between themselves; (2) an indebtedness of $———, due by W. F. Collier to J. A. Taylor on said settlement; (3) an indebtedness of $———, due by R. H. Collier to J. A. Taylor on said settlement; (4) the existence of outstanding liabilities of the firm of Collier, Taylor & Co.; (5) a dissolution of said copartnership; (6) an absolute sale and transfer by said W. F. and R. H. Collier to said Taylor of all the notes, accounts, assets, and property of all kinds belonging to Collier, Taylor & Co. This agreement also prohibits the use of said firm name thereafter for any purpose, except its necessary use by Taylor in winding up its affairs. The foregoing deeds and instruments were, immediately upon their execution, duly acknowledged and lodged for record and recorded in the office of the clerk of the Simpson county court. In none of these deeds do the grantors limit or restrict Taylor in the use or application to be made by him of any of the property, real or personal, conveyed by them to him. The only intimation on this subject found in any of the four conveyances is contained in the deed from R. H. Collier and wife, in which the grantor states that the property so aliened is to be used by Taylor in payment of the debts of the late firm, and that said Collier is to be credited by the proceeds of the sale thereof on his indebtedness to J. A. Taylor. With this exception these deeds are, on their face, absolute and unconditional.

On the said 14th day of February, 1873, J. A. Taylor entered upon and assumed charge of all the property thus conveyed to him, and exercised acts of ownership over the same. On said day Taylor issued printed invitations, addressed to all the creditors (1) of himself, (2) of Collier, Taylor & Co., and (3) of Collier, Mundy & Taylor, requesting them to meet him on the 20th day of February, 1873, in Franklin, Ky. In this general notice, mailed to the creditors, he asserts his ownership of all the joint and separate property hereinbefore alluded to; his assumption of all the partnership debts, and his willingness and ability to pay them all in full. In response to this invitation a large number of the creditors, joint and individual, assembled at the appointed time and place. Taylor stated to this meeting all the facts hereinbefore specified, and told the creditors that they must "look to him for satisfaction of their debts," and asked them to propose some policy by which he should be guided in accomplishing the desired results. He submitted an elaborate statement of his financial condition, showing a surplus of assets over and above the liabilities, amounting to fourteen thousand one hundred and ninety-two dollars and thirty-six cents. This meeting adjourned without any definite action, merely suggesting that Taylor should execute a deed of assignment to trustees for the benefit of creditors, but dispersing without carrying this idea into effect. From and after February 14, 1873, Taylor took possession, as before stated, of all the estate transferred to him, and treated all as his separate property, attempted to wind up his affairs, sold one item of joint property, and collected, including this sale, about five hundred dollars of the joint assets. This money was so mingled with his own that no definite history of its application can be ascertained. He applied part of it to the payment of a premium on a policy of life insurance, and does not account for the residue. This course was continued until May 13, 1873, on which day J. A. Taylor executed to G. W. Dickey and W. C. Montague a deed of assignment in trust for the benefit of the creditors afore-mentioned, making no distinction whatever between the joint and separate classes—desiring them all to be treated equally and alike. By this deed all the property owned by Taylor, embracing the real and personal property conveyed by W. F. and R. H. Collier, was transferred to Montague and Dickey, who accepted the trust, in writing indorsed on said deed. The deed and acceptance were duly acknowledged and recorded in the proper office. Taylor uses these words in this assignment: "It being my desire to make no distinction or difference between any of my creditors, but treat them all alike and equally in accordance with their priority, etc." The trustees executed no bond, but entered at once upon the discharge of their duties, and continued to act under the authority conferred in the deed up to the 15th day of August, 1873, on which day Page & Co., petitioning creditors, filed a petition in this court against the firm of

Collier, Taylor & Co., praying that said firm be adjudged bankrupt, on which petition they were in due time adjudicated bankrupts, an assignee was duly elected and received a complete surrender from Montague and Dickey of all the property and effects belonging to said copartnership and the separate members thereof.

It is admitted by counsel that at the date of the dissolution of the firm the estimated value of the assets of the partnership and its members was as follows:

| | |
|---|---|
| J. A. Taylor's separate estate | $50,000 |
| W. F. Collier's separate estate | 3,000 |
| R. H. Collier's separate estate | 2,000 |
| Collier, Taylor & Co.'s estate | 10,000 |
| Total valuation | $65,000 |

From February 14, 1873, until the 15th day of August, 1873—the date of the deed of assignment of the bankrupts' effects to the assignee—the title to all the foregoing property was vested in J. A. Taylor and Montague and Dickey, trustees, and from the record there appears to have been, and is no other property, joint or separate.

The debts proven against the estate of the company and the separate members thereof are as follows:

| | | |
|---|---|---|
| Against Collier, Taylor & Co | $58,290 | 21 |
| " J. A. Taylor | 28,449 | 47 |
| " Wm. F. Collier | 281 | 44 |
| " R. H. Collier | 127 | 40 |

On the foregoing facts the following questions of law arise: First. Shall the joint and separate creditors share pari passu in the distribution of the assets of the estate? or, shall the joint and separate assets be treated as the individual estate of Taylor, and the joint and separate creditors be treated as his individual creditors in said distribution? Second. Do the facts in this cause warrant the application of the rule contained in the 36th section of the bankrupt act? Third. Were the conveyances by W. F. Collier and R. H. Collier to J. A. Taylor fraudulent, and are they subject to review and rescission in this special proceeding? Fourth. Was the voluntary promise by J. A. Taylor to pay all the firm debts binding on him, and is it enforceable in this proceeding?

There is really but one question involved, and in stating it in the foregoing forms the object is to give prominence to the leading features of the inquiry. It is conceded that section 36 of the act of March 2, 1867 [14 Stat. 534], commonly styled the bankruptcy act, is simply declaratory of the formerly-established rule in equity. It is no innovation, but merely an expression, in peculiarly felicitous language, of the ancient equity practice of marshaling and distributing assets. It is equally true that the system of bankruptcy organized under the aforesaid act is mainly a system of equity jurisprudence, and that proceedings in bankruptcy are proceedings in equity. So that the matters involved in this controversy are to be determined by the rules and practice obtaining in chancery courts. The 36th section affords no field for discussion, and the issue raised is not a construction of this section, but whether the assets in the hands of the assignees shall be distributed according to the rule prescribed therein. We are confronted at the outset by the fact that Collier, Taylor & Co., as a copartnership, were proceeded against in bankruptcy and were adjudicated bankrupts under this particular section of the act; that the court obtained jurisdiction over them by the operation of this section, and that all the proceedings heretofore have been conducted according to its provisions. Some of the parties to this action, and the very parties, too, who instituted these proceedings against the firm by invoking this section, are now seeking to evade its provisions in the distribution of the assets of the estate. In the first place, was it necessary to proceed against the company under this section? Was there in existence on the 15th day of August, 1873, such a community of interest and such a community of indebtedness as justified proceedings against W. F. Collier, R. H. Collier and J. A. Taylor as partners doing business under the firm name of Collier, Taylor & Co.? We think not. This copartnership was dissolved by consent February 14, 1873, the two Colliers retiring, and at the same time conveying to their copartner, J. A. Taylor, all their joint and separate estates and effects. This was legitimate, and, in the absence of fraud, conclusive against all the world. They received good and sufficient considerations in exchange for the property transferred. None of their creditors have assailed these conveyances, nor do they appear in this special proceeding to object. The copartnership creditors have not attacked these transfers, but on the contrary insist upon upholding them. Notwithstanding this, the separate creditors of J. A. Taylor, whose ability to pay was thereby enhanced, insist that these conveyances are in derogation of their rights and should be treated as null and void. This pretension is too impalpable for further pursuit. If Taylor, who owned a large estate, had conveyed his property to the retiring partners, then perhaps some reason might appear justifying the opposition thereto by his separate creditors, but if any one is aggrieved by his receiving an additional fund with which to pay, it is certainly not his individual creditor. It is a well-settled rule that partners can convert joint property into separate property by transfers to a copartner, and it follows as a corollary that joint debts may be converted into individual debts by one partner's undertaking their payment. Of course fraud vitiates every transaction, and the absence of fraudulent intent is a condition to be annexed to the foregoing proposition. It is error to say that partnership creditors have

a lien on joint property, and separate creditors have a lien on individual property. While equity treats these two classes as holding preferences, and awards to them the priorities laid down in section 36 before mentioned, there is no principle of practice with which I am familiar under which a lien, as recognized by courts of chancery, can be enforced in such cases. This is clearly illustrated by the fact that if A and B are partners, owing firm debts, and each owing separate debts, and while these debts are outstanding, execute a joint note, which A indorses as surety, and the firm afterwards becomes insolvent, the separate creditors of A could certainly claim no preference, to the exclusion of the partnership creditor to whom A was bound as surety. If a lien existed on A's separate estate in favor of his separate creditors, whose debts were contracted before his indorsement of the firm paper, then it would be competent for them to claim and receive satisfaction in full before the joint creditor could collect his debt out of his separate estate. And this on the principle that the separate creditors were mortgagees holding his separate estate under a valid lien of mortgage. These classes only hold debts, which, by reason of the fact that one class trusted on the strength of individual estate, and the other contracted, primarily, on the strength of joint property, ought in equity to be paid out of the funds which originally received the credit; and to this extent, and no further, in our opinion, are these classes lien-holders.

In this case no actual or presumptive fraud appears upon the facts submitted. Indeed, it is clear that the utmost good faith prevailed during the entire period of gradual decay. Taylor, up to the date of his assignment to trustees, May 13, 1873, apparently believed that he would be able to pay all the debts in full and have a surplus of fourteen thousand dollars, or thereabouts. But assuming that there was fraud intended by the transfers of February 13 and 14, 1873, can it be reached in this proceeding? No one has yet attempted to vacate or set aside any of these conveyances. If the creditors desired to annul these transfers they should have proceeded within six months from the date of their execution, if they invoked the courts of the commonwealth, or within four months, if by proceedings in bankruptcy. They have done neither, and it seems to us that inasmuch as the title to this property is now in the assignee, holding directly under J. A. Taylor, through the medium of an assignment executed by an officer of this court, that the proceeds of the sale of this property must follow the title, and can only be divested by a diversion of the title. The fact of the assignee's being one person, in whom the titles all, irrespective of their previous lodgment, must vest, can make no difference, as he is expressly directed by the act to keep the estates distinct and separate, as well from the funds of one part-

ner as from his own private funds. It results from the foregoing that, in our judgment, all the assets in the hands of the assignee, whether on account of J. A. Taylor, or W. F. Collier, or R. H. Collier, or Collier, Taylor & Co. are to be held and treated as the separate assets of J. A. Taylor alone; that at the date of the commencement of these proceedings there was no copartnership and no joint estate. This opinion is strengthened by the absolute and unconditional terms of all the conveyances made to Taylor, February 14th, by his late partners. Only one of these deeds expresses an intimation as to the object sought by the parties, and it virtually impairs the force of the intimation by stating that the grantor is to have credit by the proceeds of the sale of the property so transferred, on a settlement with J. A. Taylor. These deeds were not, on their face, trust deeds; nor does the conduct of the parties before and after their execution raise any reasonable presumption that they were so intended. They were made to reimburse Taylor, in part, for the large indebtedness which he was by law bound to pay. Taylor's assumption of all the partnership debts is the next step in this inquiry. It is now an elementary principle that the promise by one to another for the benefit of a third is binding and enforceable by and in the name of the third party. No principle is more deeply rooted in the American system of jurisprudence than this familiar rule. This doctrine is tenable, it seems, even where the beneficiary was not cognizant of the promise when made, and although the consideration did not move from him. To apply this rule to the case in hearing is perceptibly easy. Taylor, in consideration of certain transfers of property to him, agreed with the two retiring partners, to pay all the debts owing by the firm of Collier, Taylor & Co. By this promise he is bound, and the joint creditors can enforce it against him or claim the benefit of it, either before or after the bankruptcy of their debtor. The general promise of Taylor to pay all outstanding firm liabilities is as much a contract, and is to be treated with as much solemnity as though he had, in writing, indorsed his guaranty on the back of every existing obligation of the copartnership. In a case similar to this, In re Downing [Case No. 4,045], Judge Dillon uses this language, in reference to the creditors of the firm, "I look upon their rights in equity as being the same as if Downing had indorsed the pre-existing firm paper, in which case they could have proved their debts against either, if not both the firm and Downing."

It follows from the foregoing that, in our judgment, all the assets should be treated as the separate property of Taylor, and all the creditors should share pari passu in the dividends arising therefrom. This conclusion has been reached after a careful study of the 19th, 27th, 32d, 33d, 34th and 36th sections

·of the bankruptcy act [14 Stat. 525], and the .following leading cases, to wit: In re Downing [supra]; In re Goedde [Case No. 5,500]; In re Rice [Id. 11,750]; In re Knight [Id. '7,880]; In re Byrne [Id. 2,270]; Black's Appeal, 44 Pa. St. 503; Bank of Kentucky v. Herndon, 1 Bush, 359; Watson v. Gabby, 18 B. Mon. 658; Murrell v. Neil, 8 How. [49 .U. S.] 426; Robb v. Mudge, 14 Gray, 534.

Thos. H. Hines, for joint creditors.

· J. H. Rose, W. O. Dodd, and Muir, Bijur .& Darie, contra.

BALLARD, District Judge. I concur in ·the opinion of the register.

BALLARD, District Judge. I have re-examined this case with great care, and I have ·considered the arguments and authorities submitted by counsel, but my opinion remains unchanged. There is ground for maintaining ·that the deeds made by the Colliers to Taylor created a trust in favor of the partnership creditors, but there is not, in my opinion, .any ground for asserting that they are fraudulent. I do not understand that either of the parties to the agreement submitted in-:sist that any such trust was created, and, therefore, I shall not pass upon the question .suggested.

COLLIER (CAREY v.). See Case No. 2,400.

·COLLIER, The (SRODES v.). See Case No. 13,272.

·COLLIER (UNITED STATES v.). See Case No. 14,833.

·COLLIER WHITE LEAD CO. (MINNESOTA LINSEED OIL CO. v.). See Case No. 9,635.